MARSH *v.* BREEN IRON CO.

1. EXECUTORS AND ADMINISTRATORS — ESTATES OF DECEDENTS — STOCKHOLDERS—CORPORATIONS—SALE.

Where a deceased stockholder of a mining company provided by his will for the appointment of two executors, who presented the will for probate and filed their bond, and where no letters of administration were issued but they attempted thereafter to give their consent to a transfer of the corporate assets, having taken no other steps to administer the estate, their action was of no effect, and proxies signed by them to be used by the secretary of the corporation were null and void.

2. CORPORATIONS—REORGANIZATION—CONSOLIDATION.

Where the officers and stockholders of a reorganized corporation knew that one-fifth of the shares of the original company were not present at the meeting at which the reorganization was authorized, and that the executors of an estate that owned a large part of such stock were

not present and their proxies were invalid, the reorganized corporation was chargeable with notice of the facts known to the majority of its stockholders and to its officers.

3. SAME—CONSOLIDATION—CONVEYANCES.

Where one-fifth and upwards of the shares of stock in a mining company were not present or represented at a meeting of the stockholders at which a reorganization was effected, and the newly formed corporation took over the assets and property of the predecessor without any consideration paid to such interests as were not represented, so far as the dissenting shareholders were concerned their rights were not affected by the transfer.

4. SAME—ESTATES OF DECEDENTS—LACHES.

And where it appeared that the persons who were entitled to share in the estate were in part infants and did not know about the acts of the executors, and that decedent's widow, who had an interest in the stock, did not learn of the existence of the stock until eight or nine years after the will was admitted to probate, and subsequent to the death of one of the executors, that she attempted to cite the surviving executor into court to disclose what had been done with the estate, that she settled with the executor for certain rentals that had been collected by him and he procured an order of the probate court discharging him as executor of the estate, as having settled in full for the assets in his hands, although third parties had become interested in the reorganized corporation, the evidence was not such as to bar the right to an accounting in favor of the parties interested in the estate on the ground of laches or acquiescence.

5. SAME—ESTOPPEL.

And third parties, who acquired an interest in the corporation as reorganized, after having made a full examination of the records and conveyances, being attorneys at law, were chargeable with notice of the condition of decedent's estate, and complainants could not be held to have lost their rights by estoppel because the third parties bought stock.

6. SAME—TAX TITLES—POSSESSION—LIMITATION OF ACTIONS.

That the second corporation held State tax deeds for the taxes of 1897 and 1899, upon the mining property, by assignment, and had remained in possession of the prop-

erty more than five years after obtaining the tax titles, did not entitle it to rely upon the five-year statute of limitations, where the duty rested on the original purchaser of the tax deeds to pay the taxes, for which the sale had been made, also on the officers of the first corporation, who became officers of the reorganized company.

Appeal from Kent; McDonald, J.   Submitted June 7, 1912.   (Docket No. 43.)   Decided July 24, 1914. Rehearing denied December 19, 1914.

Bill by Frankie E. Marsh and others against the Breen Iron Company and others for an accounting and further relief.   From a decree for defendants, complainants appeal.   Reversed.

*Eugene Carpenter*, for appellants.

*Norris, McPherson & Harrington*, for appellees.

McALVAY, C. J.   The bill of complaint in this cause was filed in the circuit court for the county of Dickinson, in chancery, against defendants, asking, among other things, to establish their title to one-fifth of the property of defendant Breen Iron Company, which it had unlawfully acquired from the Breen Mining Company, of which complainants claim to be the owners of one-fifth of all its stock and assets.   By reason of the disqualification of the judge of that circuit, the case was removed to the Kent circuit court for hearing.   The bill of complaint was answered by defendant Breen Iron Company, and, after a hearing upon the issues joined, a decree was entered denying relief to complainants and dismissing the bill of complaint. Complainants have appealed from this decree.

This record shows that, before the bill of complaint was filed in this cause, complainant Frankie E. Marsh had begun an action in trover against the Mineral Mining Company to recover the value of one-fifth of a certain quantity of ore removed by that company

under its mining lease from defendant Breen Iron Company of lands involved in this cause. This trover case was, for the reason stated, also removed for trial to the Kent circuit court. By a stipulation of the parties, the testimony taken in the trover case was treated as if taken in the chancery case, to be considered with the other proofs taken therein.

The bill of complaint in this cause is of great length and charges questionable conduct on the part of those who took part in the transaction which finally culminated in a claimed transfer of the property in the Breen Mining Company to the defendant Breen Iron Company, particularly on the part of Mr. Sawyer, secretary for many years of the Breen Mining Company. The fact that considerable of the record contains matter pertinent only to the trover case has made it difficult to make a clear statement of the facts involved in this controversy.

Complainant Frankie E. Marsh is the daughter and sole heir at law of Salmon D. Saxton, of Dickinson county, Mich., deceased. The other complainants are her children. The mother and children are all the persons who are named as devisees and legatees of the last will and testament of said Salmon P. Saxton, who died testate February 5, 1898.

In January, 1872, the testator, Salmon P. Saxton, Eleazer S. Ingalls, Thomas Breen, Bartley Breen, and Seth C. Perry, as tenants in common, were the owners in fee of an undivided one-fifth interest in and to 120 acres of timber and mineral land located in that part of Menominee county which has since become Dickinson county. This land is described as the N. W. ¼ of the N. E. ¼ and the N. ½ of the N. W. ¼ of section 22, in township 39 north, range 28 west, in Dickinson county, Mich. On January 22, 1872, these parties who owned this land organized a corporation under the laws of the State of Michigan, known as

the Breen Mining Company, to exist for the period of 30 years, capitalized at $500,000, and they, with their wives, conveyed by warranty deed the above-described land and its mineral rights to this corporation for the sum of $500,000 in full payment for all of its capital stock. The stock was then issued to each of these persons in proportion to their respective interests in the land and mineral, except that the stock of Seth C. Perry was issued to Oscar M. Saxton, a nephew of Salmon P. Saxton, who had then purchased his interest. One hundred thousand dollars of the capital stock, being one-fifth of all of the capital stock of the Breen Mining Company, was issued and delivered to Salmon P. Saxton for his one-fifth interest in such land and mineral rights therein. These men, to whom the stock of this corporation was originally issued, continued for many years to be the owners of all the stock of the Breen Mining Company and were elected each year as directors and officers of the corporation and managed its affairs. During this time Mr. Saxton gave his personal attention to its business, acting as general manager. Under this management the timber was cut from the land and development work for iron ore was performed to a considerable extent. A railroad was secured to be built from Menominee to this property across the land and a depot located thereon to enable them to ship iron ore. Twelve acres were platted into village lots, upon which the present village of Waucedah is built. The Breen Mining Company from time to time gave mining leases to different parties to prospect for and develop iron mines on this land and to ship ore on a royalty. It appears that about $50,000 had been expended upon this property in development and drill work prior to 1904, and several iron mines had been opened from which considerable ore has been shipped, claimed to be of the value of over $200,000, and it is

claimed that the property is rich in iron ore to a great depth, and at the present time is of the value of $200,000.

After the death of Mr. Saxton, the record shows that the business of the Breen Mining Company was conducted by the surviving stockholders, and that the secretary of the company was very active in its affairs. During this time two others of the original incorporators, Ingalls, and Bartley Breen, died, leaving but two of the original incorporators living, namely, Thomas Breen and Oscar M. Saxton. The business of the corporation during this period was not prosperous, and as the time of the expiration of the 30-year period of the corporate existence of the Breen Mining Company approached, which would occur January 22, 1902, the secretary of the company made successive attempts to bring about some disposition of its assets for the purpose of paying its debts, claiming that considerable indebtedness was owed by it. The record shows that taxes had been allowed to become delinquent and tax titles had been acquired by the wife of the secretary of the corporation, who was heir of one of the deceased incorporators and was a stockholder at the time. Options were solicited from the stockholders and acquired by the secretary for the purpose of making a sale or leasing of the property, but expired without a sale or leasing having been consummated. Finally the secretary undertook a reorganization of this company which was to be brought about by giving a deed absolute in form of all of the corporate property to the secretary's wife for the sum of $3,800, which in fact was to be a conditional deed to be held by her upon certain conditions for the purpose of reorganization of the Breen Mining Company into a new corporation, to be known as the Breen Iron Company, which property so conveyed in trust for all the stockholders and creditors

181 Mich.—14.

of the Breen Mining Company was to be conveyed by the wife of the secretary to the new corporation. To carry out this purpose a meeting of the stockholders of the Breen Mining Company was called to be held December 26, 1901. This meeting was adjourned to January 3, 1902, at which time the following resolution was presented by the secretary and acted upon, as appears from the record of the meeting:

"A. L. Sawyer then presented and moved the adoption of the following resolution, to wit:

" 'Resolved, by the stockholders of the Breen Mining Company, that all the real estate of said company, the same being the northwest quarter of the northeast quarter and the north half of the northwest quarter of section twenty-two (22), town 39 N., R. 28 W., in Dickinson county, Michigan (excepting only and reserving such surface rights to lots and streets in the village of Waucedah as have been heretofore granted and conveyed by said Breen Mining Company to others, but including all mineral rights in such lots and streets and including all lots not heretofore conveyed by this company in the platted portion of the village of Waucedah in said county), be sold and conveyed to Josephine S. I. Sawyer for the consideration of $4,000.00, and that the directors of said company be and they are hereby authorized and directed to cause the proper officers of this company to make conveyance of said property to said Josephine S. I. Sawyer for said sum, which said sum is to be used in canceling the mortgage bonds and other indebtedness of this company, and the taxes upon said property; and whereas, a large portion of said indebtedness is due to members of the family of Josephine S. I. Sawyer; and whereas, the term of existence of this corporation is about to expire, and it is the desire of the stockholders hereof to preserve the right to retain an interest in said property proportionate to the interests represented by their respective holdings of the stock of this company, upon the payment by them, respectively, of like proportionate shares of the debts of this company, the unpaid taxes on said lands, and the expenses of organizing a new corporation; and whereas it is deemed desirable that such lands be held by a corporation to be capitalized on a low basis and in such a way as to make provisions for meeting the expenses and disbursements incident to its existence, and its holding property: Therefore, be it further resolved, that the conveyance of said

property above authorized to be made may be made in form absolute to the said Josephine S. I. Sawyer without the expression therein of any trust, but that nevertheless the title to said property shall be taken by said Josephine S. I. Sawyer on condition that she shall perform the trust herein specified, to wit: She shall cause to be incorporated under the laws of the State of Michigan a company to be capitalized at the sum of ten thousand dollars, one-half of which capital is to be paid in by the conveyance of said above-described property by said Josephine S. I. Sawyer to said newly organized corporation, concurrently with its organization. And as consideration for such conveyance to said corporation said Josephine S. I. Sawyer shall subscribe or cause to be subscribed for stock in such new corporation to the extent of at least five thousand dollars. It shall be the privilege of the incorporators of such new corporation to subscribe for all the stock thereof, calling the same one-half paid up, or to subscribe for one-half thereof, making the subscribed stock fully paid and leaving the remainder thereof in the treasury of the company. It shall likewise be the privilege of the incorporators of such company at its first meeting to grant authority to its officers to make sale of the company's land, and likewise to grant authority to issue mining leases and options for mining leases, and options for sale thereof. The stock so to be subscribed for by said Josephine S. I. Sawyer and her associates shall be used in the cancellation of the debts of this company in manner as follows: The said Josephine S. I. Sawyer shall ascertain, as near as may be, the aggregate amount required to pay the debts of this company, the taxes upon said property outside the village lots, or all such taxes and the expense incident to forming such new corporation, and shall apportion the aggregate amount thereof upon the stock of this corporation, share and share alike. The stockholders of this corporation shall be entitled to a like proportion of the subscribed stock of the new corporation as they respectively hold stock in this corporation on condition that they shall pay to said Josephine S. I. Sawyer such sum as may be apportioned to the holdings of such stockholders in this company, as above specified, provided any stockholder in this company to whom any portion of such indebtedness is due shall be privileged to take stock in such new corporation to the extent thereof, limited only by the right of each stockholder herein to take his portion of the stock in the new company upon the terms specified. Any stockholder in this company desiring to take his or her share of the stock in the corporation to be formed and to pay the amount so to be apportioned to his or her holdings of the stock

in this company shall notify said Josephine S. I. Sawyer of such election within ninety days of the date hereof, by written notice. Said Josephine S. I. Sawyer shall thereupon notify each of such stockholders so electing to take stock in the new company of the amount apportioned to such stockholder's stock in this company and such stockholder shall pay or provide for the payment thereof as follows:

" '*First*. Such stockholder may set off against the amount so to be paid him or her any amount owing to him or her from this company.

" '*Second*. Such stockholder may pay in cash any excess of the amount apportioned to him or her over and above the amount so due him or her.

" '*Third*. Such stockholder may execute to said Josephine S. I. Sawyer, in lieu of cash payment, his or her note for any cash payment due, such note to be dated as of this date and to bear six per cent. interest per annum, and made payable on or before fifteen months from this date, and the stock for which such note shall be given shall be held and retained by said Josephine S. I. Sawyer, as collateral security for the payment of such note. The trust hereby conferred upon said Josephine S. I. Sawyer shall be considered fulfilled upon the transferring by her of such stock as shall be paid for under the provisions hereof within a period of fifteen months from this date unless she shall by agreement in writing extend the time of some certain payment or payments to be made to her. In case any debt or tax shall be omitted by mistake, or otherwise, in the making up of the aggregate sum to be apportioned to the stock of this company, as above specified, such debt or tax shall be considered an obligation of such new company. In case any of the holders of stock in the present company shall fail to pay the portions of the indebtedness apportioned to their stock so that insufficient moneys shall be realized to pay the debts and expenses of the new organization, the said Josephine S. I. Sawyer shall only be obligated to pay upon such debts, expenses and taxes such amount as she may receive, and the holders of such unpaid debts may take stock in payment thereof at the same rate that stockholders in this corporation are privileged to take such stock under the provisions hereof.'

"The motion for the adoption of the resolutions was seconded by Thomas Breen, put by the acting president to a vote, and was carried and declared carried by the unanimous vote of all the stock recorded as represented at this meeting."

The stock, which during his lifetime belonged to Salmon P. Saxton, was not represented and voting at such meeting. The total number of shares of the Breen Mining Company outstanding at that time was 20,000, of which 14,853 1/3 shares were represented at this meeting and voted in favor of this resolution. This meeting adjourned until April 14, 1902, to allow stock not represented an opportunity, if desired, to ask a reconsideration of the action taken.

The secretary of the Breen Mining Company had been desirous of obtaining from the executors of the will of Mr. Saxton an approval of the plan of reorganization and a proxy authorizing him to appear for them and vote stock held by Mr. Saxton in his lifetime at the meeting of December 26, 1901, and any adjournment thereof. This proxy, which was dated November 30, 1901, had been prepared by the secretary and sent to one of the executors named in the will of Mr. Saxton with the request that he sign it and secure the signature of the other executor. On January 10th Mr. Henderson wrote a letter to the secretary of the corporation inclosing the prepared proxy signed by himself and Mr. Huff. The record does not show the date upon which this letter with the proxy inclosed was received by the secretary.

The articles of association of the Breen Iron Company were not executed until February 24, 1902, and were filed in the office of the secretary of State March 6, 1902.

Not any part of the one-fifth of the stock of the new corporation, defendant Breen Iron Company, to which they were admittedly entitled, was ever issued to the complainants or to any one representing them for the claimed reason that the executors named in the will were unable to raise funds to pay one-fifth of the claimed indebtedness of the Breen Mining Company.

In January, 1904, a majority of the capital stock of the defendant Breen Iron Company was acquired

by George D. Van Dyke, of Milwaukee, who, at the time of such purchase, required such defendant company to purchase certain outstanding tax titles against the land, and at the same time Mrs. Sawyer made two other deeds to the Breen Iron Company of the same character as those made by her January 24, 1902. The remainder of the stock was held by Thomas Breen, one of the original incorporators of the Breen Mining Company.

After Van Dyke acquired a controlling interest in the Breen Iron Company, he and those associated with him became officers and directors, and caused the said company to execute a mining lease of this property to the Mineral Mining Company, an operating corporation, organized by Van Dyke and his associates, of which they were also officers and directors. Under this lease, the term of which does not appear, the Mineral Mining Company has operated upon this property in explorations for and mining of iron ore, which operations still continue.

Many facts and circumstances which appear in the record necessarily have been omitted from this statement of facts. An endeavor has been made to eliminate everything which is not closely connected with the questions which must be considered in disposing of the case.

The contention of complainants and appellants is that they are entitled to be determined the owners of a one-fifth of the property which defendant Breen Iron Company acquired through the conveyances from Mrs. Sawyer and all proceeds therefrom; that the attempted sale of their one-fifth interest in and to all of the property of the Breen Mining Company to defendant Breen Iron Company was never accomplished.

In the brief of complainants it is stated:

"This suit relates to the $100,000 of stock owned

by Salmon P. Saxton in the said Breen Mining Company at the time of his death and the interest which such stock represented in the said 120 acres of land and the mineral therein."

The 4,000 shares of stock of the par value of $100,000 referred to in this excerpt from complainants' brief is the original stock issued to Salmon P. Saxton.

Complainants' contention in this case is that the will of Mr. Saxton disposed of his entire estate, real and personal. Defendant Breen Mining Company insists that, as to his personal estate, Mr. Saxton died intestate. He died February 5, 1898. His will reads as follows:

"I, Salmon P. Saxton, of the town of Waucedah, county of Dickinson, State of Michigan, being of sound mind and memory, do make, publish and declare this, my last will and testament hereby revoking all former wills, bequests and devises by me made.

"1. It is my will that all of my just debts, funeral expenses and all charges be paid out of my personal property.

"2. I give and bequeath to Jessie Gates, one ladies' gold watch, she having same in her possession at this date, also one seed wreath and gilt frame. To Floy Gates, one landscape painting and gilt frame. To Murray Gates, one hair wreath and gilt frame, the above gifts and bequests to become their absolute property on arrival at legal age.

"3. I give and devise to my daughter, Mrs. Frankie E. Gates, for the purposes of and conditions hereinafter written, all of my real estate of every description whatever, of which I may be possessed of at my death for her use and benefit during her life time, and at her death to be then divided equally between her heirs.

"4. I do hereby constitute and appoint Omer Huff, of Florence, county of Florence, State of Wisconsin, and Robert C. Henderson, of Norway, county of Dickinson, State of Michigan, as executors of this my last will and testament.

"In witness whereof, I have hereunto set my hand and seal this 13th day of July, 1895.

"SALMON P. SAXTON.   [Seal.]"

The will was duly and regularly published, and attested by two witnesses. It was admitted to probate April 2, 1898, and the executors named therein were ordered to furnish a bond in the sum of $1,000. From the copy of the will given above, it appears that no disposition, in terms, was made of personal estate, although the testator at the time was possessed of such estate to a considerable amount, a large portion of which consisted of the 4,000 shares of stock of the Breen Mining Company of the face value of $100,000. The only reference in the will to personal estate is in the first paragraph:

"1. It is my will that all of my just debts, funeral expenses and all charges be paid out of my personal property."

No debts were proved against his estate, and the only testimony in the case upon the subject indicates that there were no debts. The funeral expenses were paid by one of the men named in the will as executors.

As already stated, counsel for defendant Breen Iron Company contend that this will made no disposition of testator's personal estate. We do not consider it necessary for this court to construe this will at this time. For the purposes of this case, this contention of defendants' counsel may be accepted.

Defendant Breen Iron Company, to support its claim that the interests of complainants in the capital stock, assets, and property of the Breen Mining Company were acquired by it, relies principally upon the proxy signed by Huff and Henderson, the persons named as executors, and also upon the letter written by Henderson to secretary Sawyer accepting the plan for organizing a new corporation and directing him to so vote. It therefore becomes necessary to deter-

mine the status of these men in their relation to the estate of Salmon P. Saxton, deceased. They were named as executors by the testator in his will. The certificate of the probate of the will shows that it was presented to the probate court for Dickinson county on the petition of Robert C. Henderson for its probate and on April 2, 1898, was admitted to probate. Upon the hearing of this cause, the record shows that complainants' solicitor offered in evidence a letter written by the probate judge of Dickinson county to him August 19, 1908, which contained an abstract of the probate calendar, showing all proceedings which had been taken in the matter of the estate of Salmon P. Saxton, deceased. Counsel for Breen Iron Company, who had a copy of these proceedings, said:

"So much of this letter or statement as purports to be a copy of the probate calendar we will not object to it. It is a letter from the judge of probate which was authorized, and, so far as it gives the proceedings and the date of these proceedings, we consent it may be read into the record."

The letter was then read in evidence as follows:

"Complying with your request of August 17th, I send you herewith copy of will and abstract of probate calendar, etc., of Salmon P. Saxton, deceased. Last will filed February 15, 1898, and consent of Omer Huff to act as executor filed February 15, 1898. Petition for probate of will filed February 15, 1898. Order for probate of will filed February 15, 1898. Proof of publication filed March 21, 1898. Proof of probate of will filed April 2, 1898. Certificate of probate of will filed April 2, 1898. Bond of executors filed April 2, 1898. Notice of claims to be heard by the court filed April 2, 1898. These are all the papers filed in this estate. The bond is executed by Omer Huff and Robert C. Henderson, as principals, and Edwin N. Kreamer and Richard C. Browning, as sureties."

The foregoing are all the proceedings that were ever had in probate court in the Saxton estate up to August 19, 1908, the date of this letter written by the probate judge. No letters testamentary were ever issued; no inventory and appraisal was ever made and filed; nor were any of the other proceedings had which are usual and necessary in the regular administration of estates in probate courts.

The record fails to show any action by the two men Huff and Henderson as executors of the estate of Salmon P. Saxton, excepting only that relied upon by defendant Breen Iron Company in this case. It does not appear that they entered upon the discharge of the duties of executors of the estate, or that the estate was ever administered.

It follows that the voluminous correspondence, which occupies a large portion of this record, between Mr. Sawyer, the secretary of the Breen Mining Company, and these two men, and all the testimony in the record relative to options given by them for mining leases and the sale of the property of the Breen Mining Company, as well as proxies given to the secretary of the company, and letters to act for them in the sale of its property by deed to Mrs. Sawyer, and the organization of the defendant Breen Iron Company, all done by them purporting to be executors of the estate of Salmon P. Saxton, deceased, as tending to show a disposition of the capital stock and property of the Breen Iron Company belonging to the estate of Salmon P. Saxton, deceased, cannot be considered by this court, and this court must hold that any acts and doings of these men purporting to sell and dispose of the interest of complainants, the heirs of deceased, in and to the Breen Mining Company, as such executors, were null and void and of no force or effect.

The sale of the property of the Breen Mining Company to defendant Breen Iron Company in its entirety is challenged by the solicitor for complainants as hav-

ing been irregular and void, upon very many grounds, the principal of which are that the resolution was not passed by a vote of four-fifths of all the capital stock of the Breen Mining Company, as required by law; that, at the time the deeds were made and executed by Mrs. Sawyer to the Breen Iron Company, the grantee therein had not been organized, and therefore had no legal existence. Other equally or more serious questions are raised.

Complainants in this case are undertaking to establish their absolute ownership to a one-fifth interest in and to all of the property and assets of the Breen Mining Company. For the purpose of determining that question, it is not necessary to pass upon the regularity of the sale by other stockholders of their interest in the Breen Mining Company property to defendant Breen Iron Company.

The record shows that neither complainants nor any person lawfully representing them or their stock were present and voting at the meeting of January 3, 1902, or ratified its action. Sole reliance is placed by defendant upon the claimed ratification of Huff and Henderson. We have already determined that the acts of these men in that regard were illegal and void. Further, all the persons who were stockholders and officers of the Breen Mining Company at the time of this sale are charged with knowledge that the one-fifth interest claimed by complainants took no part in such sale, and these same persons, who later, upon the organization of the Breen Iron Company, became its sole officers and managers, being owners of a majority of its stock, had knowledge, as such officers of the new corporation, of all the facts relative to the sale of the Breen Mining Company, which led up to the organization of defendant Breen Iron Company, and such knowledge became and was the knowledge of the Breen Iron Company. It follows that the Breen

Iron Company, without consideration, took possession and control of the one-fifth interest of all of the property and assets of the Breen Mining Company which was the property of complainants, and which this defendant admits that it continues to hold and control.

It is further contended on behalf of this defendant that complainants are estopped, by acquiescence and laches, from asserting ownership of this property. One of complainants was a minor at the time the bill of complaint in this cause was filed. The inference from the record is that the other children were minors during most, if not all, of the period which elapsed between the death of Salmon P. Saxton and the date when the mother discovered the real relation of Huff and Henderson to the estate of her father, which was but a short time before this suit was instituted. There is positive testimony in the record that during all these transactions, which led up to the claimed sale of complainants' property, the mother had no knowledge whatever of the true condition of her father's estate. She several times asked Huff and Henderson about her affairs, and the only information she received was that they would attend to or look after that. There is no evidence in the record of any knowledge on her part of what was being done or attempted to be done with her father's estate, except that these two men claimed to be executors. She needed means to provide for herself and children, and wrote a few letters in which she expressed a desire to realize upon this stock, which represented a one-fifth interest in the Breen Mining Company. She did not know where this stock was and was not told, and we have not found in the record who had it or what became of it, although it appears by the record that the books of the Breen Mining Company showed that it stood in the name of the Saxton estate. After Huff's death, which occurred in 1906, Mrs. Marsh, who was a relative of his, in

1907 went to his home, and his widow gave her two certificates of this stock of 500 shares each, which she said were found among the papers of her deceased husband.  These certificates were produced by complainant Mrs. Marsh upon the hearing of this cause, and she still has them.  If the record discloses where the other certificates are, it has not been called to our attention.

It is further insisted by defendant that this complainant, shortly before the bill in this case was filed, settled with Henderson as executor.  To relate the circumstances upon which this claim is based would occupy too much space in this opinion.  A careful examination of what the record discloses satisfies us that it does not support the contention of defendant, but that it was the result of the settlement of a suit which she had brought against Henderson personally to recover the rent of a farm, part of her estate under the will, which he had wrongfully appropriated.

The record discloses that, after Mrs. Marsh had begun an investigation in relation to the property to which she was entitled under her father's will, she asked the probate judge to bring Henderson, the survivor of the two men named as executors in said will, into court to disclose what had been done with the estate, and, by reason of the refusal of the probate judge to comply with her request, it became necessary for her to apply to the circuit court for an order against him to show cause why he should not act as requested, which order the circuit court granted April 3, 1909.  After demand had been made upon Henderson to turn over the money for farm rent, he wrote March 29, 1909, protesting that he did not claim to be an executor; that no letters testamentary were ever issued.  Early in July the case against him was settled and discontinued and a receipt given to him.  Three days later, July 12, 1909, an order was entered in probate court in the usual form discharging Hen-

derson as executor, after a reeicpt in full had been filed. The probate records in evidence in this case show that the statements contained in the order of discharge contradıct the same and show that they are false. The record in this case shows conclusively that Mrs. Marsh never settled with Henderson any matter except the trover case for rent of the farm, and also that complainants have never ratified any of the acts of Huff and Henderson, or either of them, relative to the sale of their interest in the Breen Mining Company.

Under this contention of estoppel and laches, it is urged that complainant, Mrs. Marsh, has stood by while third parties, relying upon the action of Huff and Henderson, acquired an interest in the Breen Iron Company. This refers, we presume, to the majority interest acquired therein by the Van Dykes and their associates. Both Mr. Van Dyke, Sr., and his son were prominent attorneys of Milwaukee, Wis., well acquainted with mining interests and at times actively engaged in the same. They were acquainted with this property, then held by the Breen Iron Company, examined the records of the title to the same, and made the purchase. They knew that Huff and Henderson were named as executors of the estate of Salmon P. Saxton, and in defendants' brief it is claimed reliance was placed upon their actions. They knew also as to the outstanding tax titles and in making the purchase of the interest for which they gave $15,500, and of which they reserved $500 for the purpose of compelling the Breen Iron Company to clear them up. The examination which they made must have disclosed the status of Huff and Henderson, in relation to the Saxton estate, and they must be considered to have purchased with full knowledge of what the records disclosed, both as to the matter of taxes, of which they had a complete record, and as to the title to the property of the Breen Mining Com-

pany from the records thereof. As to this interest the record does not disclose any equitable estoppel as against complainants, or any of them.

Defendant Breen Iron Company also contends that it acquired tax titles for taxes for the years 1897 and 1899 upon this property, and that more than five years have elapsed since acquiring such titles. This defendant had in fact gone into possession, early in 1902, of all of the premises and property of the Breen Mining Company under a claimed transfer from Mrs. Sawyer, and had continued in possession thereof under such transfer until 1904, when it received from the same grantor two other deeds of like import as the first two, presumably for the reason that the first deeds to it were made before it was a corporate entity. As we have stated, it acquired this property with notice and knowledge of the rights of complainants, of the state of the title, and the manner in which the transfer from the Breen Mining Company to Mrs. Sawyer had been brought about. Under these circumstances, it cannot be considered that it acquired possession of these premises under the tax titles relied upon. This defendant, in acquiring this property, assumed the place and the duties of the original owner, as far as these complainants are concerned, and was equitably bound to pay the delinquent taxes represented by these tax titles, and, by the conveyances of these titles to it, it acquired nothing to strengthen its title as against the interest of these complainants. These taxes became delinquent when it was the duty of officers of defendant, who were then the officers of the Breen Mining Company, to pay out of funds, which at that time or later, before the sales had ripened into title, were in their hands.

By the resolution under which this defendant claims that complainants' title was conveyed to it, and to which all of the incorporators of defendant were parties, it appears that the consideration of the trans-

fer, among other things, was to be used to pay these taxes, of which this defendant must take notice. This defendant will not be allowed in equity, under the circumstances in this case, to set up these titles against the interest of complainants, towards which interest in this property it at that time owed the same duty which rested upon its incorporators.

We do not agree with the conclusion and decree of the learned circuit judge that defendant acquired a good and perfect title to the one-fifth interest of complainants in the property of the Breen Mining Company through deeds of conveyance from Mrs. Sawyer to it, for the reasons we have already stated in this opinion, and therefore the decree of the circuit court is reversed, and a decree will be entered in this court declaring and determining that complainants, never having parted with their interest in and to all the estate and property of the Breen Mining Company, which they inherited from Salmon P. Saxton, the father of complainant Frankie E. Marsh, are the owners of a one-fifth interest in and to all of said property, both real and personal, which has come into the hands and possession of the defendant Breen Iron Company, and that they are entitled to a full and strict accounting of the whole thereof and all receipts of every name and nature from all sources which have come to the said defendant since its assumption of ownership and control thereof, and that complainants be decreed to have a lien for the amount of their interest in the Breen Mining Company against the entire property conveyed to the new corporation by a majority of the stockholders in interest against the consent of complainants; that the affirmative relief prayed for in defendants' answer and cross-bill be decreed denied, and such cross-bill be dismissed; that the cause be remanded to the circuit court for Kent county for a full and complete accounting, upon which accounting complainants will be

charged with the amount which would be their equitable portion, according to their interest, of the sum actually and necessarily paid by the other stockholders at the time of the reorganization, not to include, however, items assumed and agreed to be paid by Josephine S. I. Sawyer, and such items as may have been caused or incurred by the neglect and delinquency of the officers of the Breen Mining Company. It is further decreed that complainants do recover their costs of both courts against defendant Breen Iron Company, to be taxed.

BROOKE, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred. STONE, J., did not sit.